So, this is Galarza v. One Call Claims. If you will, Mr. Starzyk, please give Ms. Price a moment to gather things before we start. May it please the Court, Your Honors, my name is Mike Starzyk and I do represent the appellants in this case, Joel Galarza, Catherine Carpenter, and Vicki Wimberly. As the Court is aware, this is a case for overtime under the Fair Labor Standards Act. The key issue in this case is whether or not our folks were employees, as it is our position they were, or whether they were independent contractors as determined by the district court. I know we are going to talk about tests in this case and determining employment status, but from our standpoint, the real test to look at is the test under the Federal Rules of Civil Procedure in Rule 50. In your opinion, if you look at the evidence in the light most favorable to your clients, that there is a jury could reasonably find that they were employees? Absolutely, Your Honor, and not just looking at it in the light most favorable, but looking at it period, because it is our opinion that the district court I have more than you can chew this morning, Mr. Starzyk. With regard to the inferences, you are exactly correct. As this Court recently held in the Blanco v. Samuel case, that evidence, when we talk about inferences, should not be disregarded unless it is blatantly inconsistent with the record, blatantly contradicted by the record, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature. That is a really strong statement this Court has made. Which factor do you think the district court got wrong applying the correct summary judgments? It is our position that the Court got several of the factors wrong, starting with the degree of control exercised by the alleged employer here, looking at the three sworn declarations that were given by our clients. Two of them, one from Mr. Galarza and one from Ms. Wimberly, go to the heart of this issue. These statements that are so powerful, they both talk about conversations they had with folks at the Texas Windstorm Insurance Association, TWIA, as well as One Call Claims. Mr. Galarza was told by Mr. DeVillibus, the senior manager at TWIA, that they were concerned about overtime and lawsuits, because they were exercising too much control over the insurance adjusters, and that they were... So that happened pretty early on in the relationship. They were in the office. They were concerned about liability, as good lawyers are wont to do. So they said, we prefer for you all to go home, work from home, and work on a more independent basis, right? Right. It was within the first six months there. And importantly, you're correct... That means that from about a year and a half, because most of these were about two years or so. So for about a year and a half, a year and a half, months for some of your clients, that meant that they were pretty much on their own and not under the control of the insurance company. I would disagree, Your Honor, with the statement that they were on their own. They were moved to remote work. Those first six or seven months that they were in the office, though, I think are critical, because they were in the TWIA office, supervised closely by the TWIA supervisors as well as one-call supervisors. The way this works is, and I'm certainly no expert on insurance adjusting. The way this worked was, there's some sort of general guidelines that they have about some ethics rules and things that you need to comply with. But otherwise, your client would go meet with the insured. They would work with the insured or whoever, the public adjuster, the insurance buyer. They would negotiate, if possible, within ranges given by the insurance company. They'd settle if they could. If not, they'd go to arbitration or appraisal. But your client did that all day-to-day without someone over their shoulder or without reporting day-to-day to a boss or anything like that, right? To some extent, Your Honor. Because of the positions our folks held, especially Mr. DeLarza, he handled litigation matters. So he was being supervised and consulting with the folks, especially at TWIA, with regard to how to do this and what he was going to be authorized to do. In other words, he was at a table with the lawyers during litigation as the representative of the insurance company, right? He was, but he had to get authority, especially when he went to mediations and things like that, from the TWIA folks. So what you're saying is, listen, you have the ability to settle up to about $50,000. Beyond that, give us a call, right? In some instances, yes. In some instances, he had to get the authority from the get-go. But yes, in some of those instances, that alone... So that seems to be a lot of independent action by the clients on day-to-day operation of their job within prescribed limits given by the insurance company, right? Well, two things. One, it would go to one of the factors. Only one of the factors. That goes more to the skill and initiative required in performing the job than anything else. Again, the control is a much broader issue, though, because these folks were not just on their own like that, especially the first six or seven months. They were constantly supervised. It wasn't until Mr. DeVillibus, Mr. Hanks, Mr. Byron were making comments about, we're going to put them to remote work. Once they had remote work, that didn't necessarily change. But yes, they were insurance adjusters. There's no exemption issues here in this case because they were paid a day, right? I want to make sure that's clear. Yes, sir. They were paid just for that, which seems to be relevant for control. They had to produce time records, right? And they were paid on a day basis. So they weren't paid like per job or something like that. They were just paid for the days that they worked. They were paid the days they worked. And as the Supreme Court made clear in the Helix Energy case versus Hewitt back in 1923, if someone's paid a day rate, a high wage earner and I know there can be concerns sometimes about that, but a high wage earner paid a day rate, that does not constitute a salary. So none of the exemptions kick in. If they work more than 40 hours in a week, they're entitled to overtime. And here the evidence submitted, their time sheets, I mean, all three of our folks testified they were scheduled 55 to 70 hours per week. They were scheduled, I'm sorry. Yeah, required to work like 8 to 6. Right. And certain hours, you had to get prior approval for Sunday work. That's correct, Your Honor. They were actually scheduled like an employee. They had to get approval to do things. Initially, they were able to work more hours. The Sunday issue, we briefed that considerably that Ms. Wimberly was threatened with termination if she worked on a Sunday without permission. One of the bosses from TWEA said, I don't want to know if you're working on Sundays. Again, contractors work when they want to work. Contractors get it done when they want to get it done and need to get it done. They're not told you need to be in the office or you need to be online or you need to do this or you need to do that on a consistent basis. And all of the evidence shows that's exactly what was occurring here. So the factor, you think, goes to that the district court got wrong? The permanence factor, for sure. I mean, your clients, the contract was temporary. There was no one-year period. There was no automatic renewal. In fact, one of your clients, as I understand it, started with the insurance company, left to work for another insurer, came back to work for the insurance company, and then left again. The company allowed them to work for anyone else they wanted to as long as it wasn't inconsistent. Did anybody work for anyone else? Let me answer that. No. And quit. Justice Brashard, let me answer your question real quick. I'll turn back to Justice Luck. No, they didn't work for anyone else. And the reality was, you can say that. Again, we get into this label of, oh, they could work for whoever they wanted. When you're scheduled 55 to 70 hours a week and you're working more hours than that to keep up, there's no time to work for anyone else. So you can make that statement. Justice Luck, with regard to... I just kind of lost my train of thought. The contract with the temporariness... The contract's not decided. I guess my question is, they've only worked for a year and a half to two years. They worked during a spike in the storm and then left when other people came for a different company. How is that a permanent employment relationship? Actually, they didn't leave because of that. A couple left earlier and one was released. They could have still continued working there. To put it in perspective, it's no different than at-will employment. People come and go all the time. They're at one company, they leave, they find maybe the grass wasn't greener for whatever reason, they come back. That happens all the time. The fact they worked a year and a half to two years, generally, that's actually longer than most law clerk internships are. What about a free year? We don't want them more than that. At least, at least some of your clients who left after three months or so, went to another company, and then decided to jump back, and then after a year or so, jumped to another company? I think it was just one of them that did that. The others worked continuously, and then when she came back, she worked for, I think it was, 14, 15 months. Absolutely. It seems no different than at-will employment. She quit her job to go to a different job, and then she quit that job, too. Then came back, just like an at-will employee does all the time. The district court really focused on this temporary word, using it, I think, six times in her opinion, and ignoring the fact that they were actually working not just a couple of months, but working a year and a half, two years. The temporary factor, the permanence, definitely weighs in favor of employment status. I see my time is up. You say five minutes. For the record, sometimes the Walharts don't want to work for us anymore. That's true. Why don't we hear from Ms. Price? Thank you. May it please the Court. My name is Ann Abrams Price, and I am here on behalf of the FLE, Texas Windstorm Insurance Association. We believe that the district court's opinion was entirely proper and should be affirmed. The district court, the magistrate, properly applied the controlling authority with respect to the Scantlin factors, and meticulously weighed and evaluated, and did not assume the plaintiff's facts to be true. And in some cases... ...that we just talked about. So, in a case called Ussery from 1976, the Fifth Circuit, which was binding on us, said that a one-year term was permanent, and counted in favor of finding someone to be an employee. Isn't that exactly the opposite of what the district court did here? Well, I think in this case, it's not so much, and as the Scantlin factors agree, it's not so much the duration in a vacuum, but whether the relationship is intended to be indefinite or permanent. In this instance, the... Explain that to me, because I don't understand why that would matter. There are all sorts of employment agreements that have a specific term. I thought the issue really was just, is it supposed to be for a unusually short period or project-based? Not just that it's got an ending to it. Well, first, this was project-based. It was related to a specific occurrence. But the contracts were for a year, though, right? Not in this case, no. They were, no. The contracts were not for any particular amount of time. So, that makes it different than Ussery, because Ussery actually was for a term of one year? I believe so, but it's been a while since I looked at Ussery, so I'm not sure. It's right here. It says the contract involved here is for a one-year duration and is routinely renewed. That is directly from the opinion at 1314. Right. And in Scant... What does the contract here say? The contract here with OCC, the other defendant, says that it's temporary, and I'm not sure that it has any particular duration. And that it is project... And that it's by project by project, and that assignment by assignment. When you say project by project, do you mean vis-a-vis the employee-session-dependent contractor's project, or do you mean the project that the firm is working on? The agreements with OCC, the other defendant, are assignment by assignment, and they deal with the assignment by OCC to the service recipient, TWIA. And they were, in fact, in Mr. Galarza's case, I don't know if you look at his contract, which was attached to the complaint, there are at least five or six different assignment addenda. And what's significant here is when we look at duration, permanency versus temporary, in the Scantlin case, the reason why the court found that it was permanent is that those contracts were, again, for a year's duration and automatically renewed. And with respect to employment at will, employment at will means that it's an indefinite relationship. It doesn't have a particular term. So I don't think that's a particular term. In the Scantlin case, that's what you described the contract as, indefinite. Correct, but in the context of project by project, which is completely contradictory to permanence. I mean, you could call it temporary, and contrast it with HUSERI, where it's a one-year contract. But in a way, as I listened to it today, it suggests to me that it hurts you, because it's of indefinite duration, which sounds to me more akin to an employee situation. Well, I respectfully disagree, and we need to look at the context. I mean, in the employment relationship, there's no guarantee of any particular duration, but theoretically, it could go on for 10, 15, 20, until retirement years. In our situation, it was inherently temporary, project by project. I get how that could conceivably, under certain circumstances, be a factor, right? So if the idea was, I am hiring you for this specific project. So if, for example, you hired an independent adjuster to adjust a specific claim, right? I understand how that would, you would say, okay, look, once you've done adjusting this claim, this is over. Is that what happened here? Yes, I believe that is. I mean, it wasn't just one... No, no, no, no, no. I'm saying conceptually, it's the same thing. But that's not what happened. It seems like it's more conceptually the same as an insurance company that hires insurance adjusters as employees and says, we're hiring you because we've got a bunch of claims that we need to adjust. You know, if we don't have a bunch of claims that need to adjust, we don't need you anymore, and we'll fire you at that point. But like, the reason we're hiring you is because we've got a bunch of claims we need to adjust. How is it different than that? Well, I think it's different because the employees are hired for an indefinite, potentially, 10, 20, 30 year period. Right, but it's... Well, that's precisely where I think it is different. An employee is hired because we're an insurance company and we expect to have a certain amount of claims. And so we hire a staff of employees to handle those relatively ordinary amounts of claim. When you have a storm of historic proportions like Harvey, we need to turn to independent professionals who already possess the skills and the licensure and the experience, who have businesses where they go from disaster to disaster to disaster, filling in this particular need. The evidence here is that the reason that they were hired was for a specific project, i.e. the spike, the specific spike in Hurricane Harvey claims? Exactly. And is the evidence also that these individuals left to then work on a different hurricane, with a different spike, with a different company? Yes, at least with respect to... Mr. Gularza admitted that he worked as an independent contractor in the insurance industry after leaving. And Ms. Carpenter contested a fact that she left to work on a different hurricane. I'm not sure, I don't remember exactly what Ms. Wimberly's facts were. And the other thing to keep in mind is that this is a multi-factor test where the... Let's go to another factor, the supervision, because it seems like having them fill out time sheets, preventing them from working on Sundays, telling them they have to work a certain number of hours a day, all of that seems very employee and not independent contractor. Well, when we look at the controlling authority in Scantlin, the type of control that is dispositive is control over the manner in which the work is performed. What about the software that's installed? What about the software that's installed? Well, that... Are you talking about manner? Right. Well, the software, there was an allegation, the fact the plaintiffs allege, or the plaintiffs' affidavits say that software was installed that could enable monitoring of, you know, various factors. But there was no evidence that TWEA actually did such monitoring. If it's not favorable to the plaintiffs, wouldn't we have to infer that it was installed not... for no other purpose? Well... And then they never used it, but that it was actually installed... Well, it may have been installed for other purposes, but even if we go that next step, that does not shed any light over control over the manner in which the services... How does not controlling the hours on which someone is allowed to work, doesn't that control the manner in which they're allowed to do their job? You've told them you have to do it between 8 and 6, Monday through Saturday. I don't believe that it does, because that's just setting a parameter. Do you think they're normal independent contractors? Like, have you ever hired a contractor to work on your house? And try to tell them when to show up and when to leave? Well, I've certainly told them not to come in the middle of the night. That wouldn't be allowed. I mean, I think that is totally... These are... This is when I'm available, this is when I'll show up, and I'm going to keep working on it until, like, it's done, right? That's the way an independent contractor works? In some situations. But here, looking at it holistically... Do you think you have an independent contractor that works a schedule that is from 8 to 6, required by the client to be an independent contractor? This particular case? Outside of this specific case. We're very... Well, I mean, me, for example. You know, I have had to work, you know... So you're telling us that you're required to work from 8 to 6? And you do? Yes. But they require me to, you know, to work at certain times over which I have no control. And I am still an independent contractor with that, with respect to that. What if a client told you that they wanted you to work from 8 to 6 and only 8 to 6, and that requires you... I... Would you take that client? I have had clients like that. I have filled in while in-house attorney, where I'm maternity leave, and worked from 8 to 5... Well, more than 8 to 5. Yeah, in-house attorney sounds pretty important. No, no, no, no. I was subbing in for an... I was subbing in from my firm for an in-house attorney who was on leave. And continued to have full control over the manner in which I delivered my services, and remained properly characterized as an independent contractor. I'm out of time, so... Unless you have further questions?  May it please the Court, I'm Jack Wisdom with the law firm of Martin, Asir, Jefferson. In Wisdom, I represent one called Claims. Just to frame the issue and get to the heart of it, as you requested, this is a case about people who made the entrepreneurial decision, took the initiative to develop a skill set, get licensed, in two cases here, form LLCs, invested in the necessary equipment... What was the equipment that they had to invest in? So, in this case, cell phones, a computer, internet service, or the three necessities, a place to work... So that's work for a long period of time. So they work there for months. For like 6 or 7 months, right? Well, in this particular instance, so I'm talking generally about the life of the independent adjuster, the independent adjusters go from storm to storm, job to job. So, in this case, what did these people have to invest in? Well, in this case, for a period of time, for a season, as a matter of convenience, they didn't work in the offices. But they adjusted to claims independently. Did they have computers when they worked in the office? They could have. They were not required to use the company computers. Well, I don't know. There's no evidence one way or the other. They definitely owned their computers because they provided similar services for other businesses as independent business people. When they worked at home, what equipment did they have to do? Did it include a car? Did it include insurance? In other words, their own insurance? Well, they had to make their own business decisions about what kind of insurance they would purchase. They got to make their own business decisions about the kind of equipment they would get. They did incur expenses for meals and travel. These people often lived in other places and came in where the storms were. So all these expenses were incurred. And, of course, they properly, as good, smart business people, noted those expenses on their taxes for their LLC. These are independent business people. That is the point. Yes? One of the factors that we should look at is whether someone can control their profit. So they could, you know, if you're in a contractor and you're someone who, you know, or a place owner or something like that, you can do jobs. You know, you can hire other people to do the work. You know, you can use leftover material, things like that. And so you can increase your profit margin. You can control your profit margin. Was there any way for these people to control their profits? Well, Judge Brasher, thank you for that question. And your other questions indicate you are thinking in terms of certain types of independent contractors. There are all kinds of independent contractors. Well, in this case, much like the welders in the Harrell case or the directional drillers in another case where independent contractor status was found, the opportunity to control their profits was limited. It was on a strong factor one way or the other. But what they could do is decide what kind of expenses they would incur. And then they could recover those expenses or claim those expenses on their tax returns. They could also, as independent business people, find a better storm, find a better opportunity. It seems like this factor, at the very least, it seems like this factor cuts in favor of them being employees because it seems like the only way they could control their profit would be to do the kinds of things that employees do all the time. You know, like employees for your law firm, they could spend less money on the suits that they wear to court, right? I mean, they can do things like that. Well, they certainly seem to do that these days. It's the same kind of thing, I think, that you're saying. Instead of buying the Lexus, they could buy the Toyota. Judge Brasher, you're right. There's a lot of overlap between any independent contractor and any employee. You provide, you do work, you get paid. You make decisions all day long that impact your fiscal health and well-being. But in this case, you have highly-skilled, highly-competent... Yes, yes, Your Honor. On the Lex that you mentioned a moment ago, I thought there was evidence that the adjusters actually not only were furnished computers and telephones by the association for their in-person work, but that they actually used them. Well, I think there is evidence that they were made available and they were used. And they used them. Yes, but there's no evidence they were required to. And then for a good part of the relevant time period, they were not furnished such equipment, and they used the equipment that they previously had as independent business people. So, yes, there was that evidence. And on the permanency issue, just to be clear, they were hired for a specific assignment, a set of claims relating to Hurricane Harvey. Those claims were going to play out. There were more claims than... There were a ton of claims, having lived through Harvey. But they did eventually wind down. And so the specific nature of the assignment, and this is not seen in any employment agreement that I've ever drafted or reviewed, is it spells out this is a temporary project-based assignment. The project was the collection, the mass surging claims related to a catastrophic storm. But, of course, that's just another day in the life of the independent examiner. This is what they live for. They pray for rain and strong winds, and they go where the money is. And God bless America that they can do that. The other thing, just to note, back to control, I do want to bring the Court's attention to the magistrate judge's careful distinction, which your Court has acknowledged and defined before, between the contours and parameters, which may be managed, and the manner of the work, which is not managed at all, or managed minimally, as Judge Luck pointed out. The latitude these individuals were given as they applied their specialized skills for a high compensation to make consequential decisions on the fly is critical here. That was the manner of the work which was not controlled. Thank you. Your Honors, the first thing I want to turn your attention to, Justice Brasher, you were talking about the ability to control profit. And you hit the nail on the head. These are no different than employees. And we start talking about the work outside the office, with, well, what did they do and how could they control this? They had internet, computers, a computer, and a telephone. That's very analogous to the Sachse case, where the Court said, yeah, those are household things. You have those anyway. It's not like you're incurring more expense or making a decision there that's going to impact your ability to make a profit or whatever. You were making this day rate for every day you worked. You wanted to work as many days as you could. With regard to the tax returns, Mr. Wisdom mentioned this. Our folks were playing within the rules of the game that was created for them. They go to work for this company and they say, you are an independent contractor. A smart person then has to figure out, what am I going to do? They go to CPAs and they do what they need to do to write off those expenses. That's not anything. So when they get in here, are they going to give back the money for the tax write-offs? I'm sorry? When they get in here, are they going to give back the money for the tax write-offs? They will have to make adjustments, I think, to different expenses. Do you guarantee your clients that they're going to pay back the IRS for all the money that they made to cover deductions as independent contractors? I don't know how that works. I'm not a CPA. What I can tell you is that from a wage standpoint, they would have tax consequences for sure. I don't know the impact of if you were misclassified as an independent contractor, took those expenses, and it's later found you weren't. I don't think that's on my folks. That's on the company who's been avoiding all these taxes and expenses and passing them on. But I don't know the answer to that and how that works. All half of an LLC, having your own independent company, none of that is going to be paid back to them? They get to keep that and the employee and the overtime pay? I don't know the answer to that because I'm not a tax professional and how that works. We'd be going back two years and then saying, okay, well what did you do here and now you've got this money, certainly now you've got this resolution or whatever. You've got tax consequences. I do not want to represent that my clients would or would not do something because I don't know anything about the tax side of that deal. But I think the important thing is they're playing within the rules of the game that was created for them. So for the company to say on the one hand, look, they did all these things. On the other hand, they created the rules that they had to play by. Our test is not about legal fictions. Our test is about economic reality, right? Absolutely. Was the economic reality that your clients took tax deductions as a result of their designation as independent contractors? They did take tax deductions. That was the reality for them, wasn't it? That was the reality for them. Again, the rules are created for them. They played within the rules of the game that was created. So again, I think that factor still goes back to weighing in favor of our clients. There was also discussion...  One of the Scantlin factors? Tax treatment is not one of the Scantlin factors. So it's not an independent contractor? No, it goes to the whole... No, that doesn't. We're talking about economic dependence, though, when we look at Scantlin from that standpoint. The assignment... Justice Brasher, I think you hit the nail on the head again with this duration type thing. This is no different than at-will employment. And whether or not folks left or not, just like they do in an employment situation... Is the factor dealing with opportunity for profit and loss depending upon managerial skills? Has the courts not specifically looked at the ability to take tax deductions as part of the managerial skills? Have the courts specifically done that? The district court did do that here.  But it didn't make it up. It was relying on case law that looked at that as a basis for managerial skill in which to maximize profits. Right. That's true. But in this case, again, they couldn't really do anything. They're being paid this day rate. You have these basic expenses. Once they went remote, they have these basic expenses and there's not much you can do with them. Again, it's a computer, it's internet, and it's a phone. It's your basic household services. From that standpoint. I want to hit one last point real quick. There was a question about inside the office. Were they required to use the computer? They actually did. All three declarations state they did. Ms. Carpenter went so far as to say she wanted to bring in her own chair to use at her furnished workstation and was told she could not. So again, it goes back to them providing all of those, all of the necessary equipment for the job. We respectfully request for all of these reasons that this Court enter a ruling reversing the order of the District Court and remanding this case for trial. It's a summary judgment, right? So what you would want is vacate and remand. Correct, Your Honor. I'm sorry. Okay. We understand the case.